We have four arguments this morning, and we will begin with number 23-2117, Mondis v. LG Electronics. May it please the Court. The District Court erred in granting a new trial on damages following the first trial, and the verdict should be reinstated. The new trial rests on two interrelated legal errors with respect to the apportionment of these agreements, a recurring issue in this Court's jurisprudence. First, the District Court held that it violated this Court's decisions to assert that a patent could command the same price as a small family of continuation patents as a matter of law, not as a matter of fact, taking that issue from the jury improperly. Second, District Court was led into error by LG, which improperly argued that because other family members of the 180 patent were blocking patents and standard essential, that a license to the 180 patent would be worthless. This was error and is unsupported by any of this Court's jurisprudence. These legal errors rendered the new trial order an abuse of discretion. Accordingly, the remedy is to reinstate the verdict and remand the case for further proceedings on other matters, including attorney's fees, extraordinary case, and interest. So you're talking about the damages questions now, and I do want you to talk about that. I do hope that you will take the initiative of addressing the written description cross-appeal question too, because that seems to me at least a significant question, and rather than you be limited to rebuttal on that, I'd like to hear your view of it. You can do them in any order, but... I'll do them in the order that Your Honor has suggested. It's a little bit complicated here, given the cross-appeal. I do want to have enough time to address written description. Why should we not understand that District Judges setting aside of the 2019 verdict and ultimately granting a new trial as not an abuse of discretion because even though it is possible, and I don't mean theoretically possible, I mean maybe even in the real world possible for there to be a scenario in which you can't really find the value of, to simplify, one of two patents to be smaller than the value of licensing them in a package, an expert would have to establish that this is one of those circumstances, and the major thing that the expert did here was to say, and not just the expert, but I guess the internal, maybe both Lamb and Spiro, this is what we do. And Omega did clearly say, saying this is what we do is not enough, and as an economic matter, that's certainly got to be right. You can't just control the outcome by saying this is our policy. But why couldn't the District Judge have said, well, that was the major piece of the economic testimony, and that's not enough, so you're going to have to do it again. That would then leave a question of whether restrictions on what was to be done the second time were too rigid. But at least on the grant of the new trial, I guess that's what I'm interested in hearing about. Sure. So Omega was a very different case on the facts. In this case, we had a license agreement actually between the two parties to the litigation, which is quite unusual, that had a rate in it, 1%, that was defined in a letter attached to the agreement that showed exactly how the license was calculated. There was evidence in the case that there were actual license agreements that were entered into at a quarter of a percent for the television patent alone. And that evidence was based on what we called the DDC2B family. But the whole problem was, I think, tell me if I'm wrong, was separating the 180, I think that's the number, from the other, depending on how you count, four or seven patents in the family. All of the licenses, there was one license, Your Honor, that actually had a specific price for the 180 patent, if you want to go that far. That was the Hanhai license. There was a provision 4.4 that said the full amount was due in that license. I thought the Hanhai license actually listed all eight in that family. It had a provision 4.4, which said if any of the following claims, if any one of the The full amount is due under this agreement, a very specific provision that had an actual rate for the actual claim in suit. So that kind of evidence simply did not exist in Omega. Plus Omega, there was a policy that was stated by the licensor, but it was not shown to have actually been followed or agreed to by third parties. Here we had 29 licenses, and even Mr. Hansen, LG's expert, agreed that the standard rate for the family was 0.25%. Now you have continuation patents, so you have to deal with the economic, the technical comparability issue as well, which was not dealt with in Omega and some of the other cases at issue where someone just says, I have a license agreement for X dollars, and I have 100 patents in it, so I want X dollars for my one patent. We provided technical comparability evidence from Mr. Lamb, which clearly stated and was uncontested that the 180 was by far the most valuable patent in the family and had by far more usage in televisions. That evidence, of course it's qualitative, but it's relevant, and we provided the link there between the 180 and the rest of the family, and it should not be surprising. So being the most important, how does that get you to, we get the entirety of the amount as opposed to, I don't know, 80%? Three reasons. One, Mr. Spiro testified that that's what was done in his program. Two, not what his policy was, but was actually agreed to. Two, our licensing expert, Mr. Braddock, said that this is the way licenses are negotiated in the real world. You can't command a greater price for a continuation patent than for a base patent, because a licensee will never pay twice, and a licensor would never charge twice, and Mr. Spiro said that he would never do that. He would never license a continuation and then sue someone the next day on a later continuation. That's not the way licenses are conducted in the real world. And third, even if you want to require a standard which could never be met in almost any case that comes here, to show an actual price for an actual claim and sue, we have that in the Hon Hai license, which says as long as claim 14 is valid, you have to pay the full amount of the license. So that has actual apportionment built in. I don't think that's required under this court's law. You can't make it too difficult to prove reasonable royalty or no one will ever be able to prove it. If this corpus of evidence, the 29 licenses which we have portioned down to the patent and suit specification, provided technical comparability evidence, provided economic comparability evidence, if that's not sufficient to create an issue of fact for the jury, then it's not clear that anybody can meet this court's standard for a reasonable royalty. Let me add... Can I ask this question? On the assumption, which I think you've just explained why you disagree with, that on the assumption that it was permissible for the district court to grant a new trial on 2019, maybe not for insufficiency of the evidence in a J-MAL sense, which it didn't end up granting, but for against the great weight of the evidence or it's in fact a bunch of the testimony was infected by what we now understand from OMEGA to be a legal error, nevertheless, so we're now at the second stage and you say, we don't have this, but Mr. Brattick's 2021 report, not in the record in front of us. We have the very extensive description in terms of four observations plus one other thing, the Hansen alternative. What specifically, what are your concrete pieces of evidence or assertions that you think were improperly excluded at that stage? Very concretely.  I would start with the... Mr. Spiro was prohibited from discussing other licenses and we were prohibited from introducing an evidence, any license that was on the pretrial, in the pretrial order, but was not actually entered into evidence at the trial. We were prohibited from making the argument on the Hanhai license, that section 4.4 gave a very specific price, it's confidential, but a certain number of cents per unit and arguing that that would be a low number, which could be enhanced because of the infringement and validity certainty you'd have in the hypothetical negotiation and that would be a higher number. You were not allowed to argue that as a lawyer in closing and was the Hanhai license introduced into evidence? The Hanhai license was introduced into evidence and the ruling at the trial was that I was prohibited. You put Mr. Hansen on, got his number out, I was prohibited by the judge from even arguing based on the evidence in his admissions what a specific number is that the jury could draw from the record. I was prohibited from arguing that the Hanhai license supported a higher number. I was prohibited from arguing the 0.25% times the base would be $25 million and the court should enhance from that because he said, well, that's just what you did the first trial. I was not allowed to make those arguments in closing. Whether that would make a difference will depend on how you rule. If you send it back, we'd go back, I suppose, to the point before the new trial order was entered. You'd have to redo the work and we'd have to see where we go, but the trial was deeply constricted as a result of the no new evidence ruling and the instructions during the trial as to what evidence we could produce. There was also evidence from, one yellow here, and I didn't get to a written description. Don't worry about the clock so much. I'll worry about it for you. Thank you. I have to ask. Can we talk briefly about the written description? Yes, certainly. Here's one kind of threshold question. I think everybody is in agreement about the following, but I want to be sure. When the specification talks about an identification number for the display, it doesn't use the word display, right, but the display device, you understand that to be a number unique to the particular unit that is like a vehicle identification number. Two different, identical copies of the same LG television would not have the same identification number, right? I don't agree with that, Your Honor, according to the patent specification. Dr. Stevenson's theory was that the... So, there's a serious language problem here that I'd like to kind of put behind us so we can talk about the actual substantive issue. I don't remember your disputing that the identification number was like a vehicle identification number, unique to a particular unit, different from the identification number of 13 million physically identical units. But you said, well, that identification number can have built into it certain type information. I don't accept the premise that the identification number has to be different for every single display in the world. The identification number has to be sufficient to communicate the information necessary to make the embodiment work. Can we back up a minute? There's no type identifier description in terms of actually using the word type identifier in the specification, right? There's one or two stray references that aren't sufficient for written description. Nobody pointed to those as defining it in the way you want it. There's only one reference to type, one or two references to type. Obviously, it's well-known that there are different types of displays and you don't have to use in-hoc verba to get a written description. There are four reasons why the written description determination by the jury and the judge was appropriate. First, Dr. Stevenson's admissions. Second, Mr. Lamb's testimony on the embodiment at column five, line 62, which showed that an identification number could be used to determine whether there's a communication function, not a unique display from all the others in the world. That was directly contrary to Dr. Stevenson and LG's theory. Third, the credibility finding in the district court that his credibility had been impaired. Fourth, the fact that the PTO specifically agreed to this amendment during an office interview. Not dispositive, but under this court's case law, it is relevant. Those four pieces of evidence were all heard by the jury, they were all heard by the judge, and the judge concluded that the jury had failed to meet its burden on clear and convincing evidence. Okay, can we back up a minute? The one you were talking about, I understand three of those, but the one I don't. What I want to really ask you is, let's assume, and this is mostly going to the impeachment testimony, that their expert was impeached. There's no evidence from them about why there's a lack of written description. But we find there's nothing in the specification itself that supports written description. What do we do then? I think that you have to affirm the district court's ruling, because this court is a court of review, and there's an important division of labor between jury, judge, and court of appeal.  Because there would be no evidence on written description at all without linking evidence from which the jury could have concluded they met their burden. Because it's their burden on clear and convincing evidence, they have to come forward with something more than putting the patent on the table and saying, and an expert who Well, okay, let me add one piece. And then ask the appeals court to fix it for them. Let me add one piece of information to that hypothetical then. They point out, and you don't dispute, that there's no specific written description for type identifier. That's undisputed, right? Or can we just assume that's undisputed? No. So the actual words type identifier That's the actual word type, yes. No, I'm not trying to make you give away your case. That's what I mean by that. There's no dispute that there's no discussion of what a type identifier is in the specification. And so they put that piece of evidence in. And so all we're left with is a presumption of validity, but also an undisputed fact that the patent doesn't specifically describe in the actual words type identifier. Well, we have Dr. Stevenson saying that he would consider the type No, don't go beyond. I'm asking you a hypothetical what we do with only those facts. We have a presumption If you have a presumption and you have a conclusion from an expert who lacks credibility Okay, so we don't have to get to the expert here. I can read this patent and you agreed that there's no specific discussion of type identifier. There's not. The word type identifier appears only in column one. But Mr. Lamb testified that at column five, line 62, an ID number is used to determine whether a device has a communication function or not. There are two types of devices. Isn't the question here whether one of ordinary skill in the art in reading the specification would find possession of this particular limitation, notwithstanding the fact that there isn't any explicit disclosure of possession? Yes, Your Honor. Isn't that the question we have? Yes, that's the Inhofer rule. You put an expert on and the expert said, I believe one of ordinary skill in the art would read column five, line number six next, and there find possession therein. Correct? Correct. Wait a minute. I'm sorry. Your expert, Mr. Lamb, did not testify. Have I written a description? He testified in the opening part of the trial. Introducing the patent to the jury, going through the specification, and explaining what it disclosed. Dr. Stevenson testified, and he was a very poor witness, and he gave us the admission that a type ID could be a serial number, which is what the jury heard. Is there a description of serial numbers in the patent? He said serial numbers and identification numbers are the same. No, that isn't the answer to Judge Hughes' question. Judge Hughes asked you whether or not there's a serial number disclosure in the written description. Yes or no? The word serial number does not appear, but identification number does. Isn't that the correct answer to it? Well, disclosure is what it disclosed to one's skill in the art. Dr. Stevenson said a serial number was an ID number. So what you're trying to say is you added during prosecution to get over invalidity objections the use of type identifier. Yes. That's not in there. Identification number is in, which at least during the prosecution was looked at as a specific identification number. And now you're saying that because a serial number can have a type identifier, and that we then go to the next inference that a serial number can be the same as an identification number, that that's enough for written description. That's one way to get there, Your Honor, yes. Dr. Stevenson told us that a type ID could be a serial number, and a serial number could be an identification number. It could be, but it's not necessarily. You're piling two different inferences on top of each other when we can read this patent. And we don't see anything like that. And we don't have any expert testimony to support it. You have to read the patent as one of skill in the art would. And Mr. Lamb said that an identification number in column five was used to determine a video format for the device. Did he make that testimony in front of the jury in connection with written description? He made a testimony in front of the jury in connection with describing what the patent said in his opening remarks before doing the infringement analysis. Do you have a site for that? Yes. Can we look at that? It's column five, line 62 of the patent. Yes, yes, yes. The site for his testimony, his opening statement. Yeah. It is appendix 20290 to 20291. And we addressed it in our brief as well. I don't have the page number in front of me. You have that in front of you so you can read it to us? 20291. You might want to start at line 11. He's at line 11. Well, there are also identification numbers in the upper passages, column three, lines 14 through 21 of the patent. And it's basically saying the identification number enables the computer to communicate with the information output device. And the patent uses some language from time to time. Information output device is basically the display screen. And so what is happening here is that the identification number is used to help the computer figure out how to communicate with the display. And now you're going to get to the column five. Yes. And then you also have a lower excerpt as well. That's referring to column five, line 62. What does that represent? Well, this is where I'll try to read this in a format that makes a little more sense. This is column five, lines 62 through 67. And it basically says the ID number identifies that the display device having a communication function is connected. In this case, the communication function that they're talking about is an actual video format. So the ID number is defining what video format the display is capable of receiving. So the ID number identifies the video format. Different types of devices have different video formats. That was his testimony. That was in the record. Dr. Stevenson's testimony said that type ID. He's connecting that to an ID number for identifying a type of said display unit? Precisely. In column five, line 62, yes. No, but I mean, in his testimony there, he's connecting column five to the limitation? Yes, he is. You read all of that to us, but then you made some statements after that that video format necessarily refers to a type of display. Where's the testimony on that? There was testimony in the case that RGB and monochrome. Because this could just as easily be read as using identification number in the way that they're urging, which describes a specific display. And it may refer to the fact that that display has a certain type of capacity, but it's still not identifying a type of display. It's identifying the capacity. There are different video formats which denote different types. You don't need to be an electrical engineer to know that answer. There was no testimony about this from Dr. Stevenson. This is the only testimony in the record on what that version means. Where's the testimony that different video formats are equivalent to different types? Yes, I believe there was. I'll have to pull that out. Can I just ask you again, because we're getting into the weeds on this. We can talk about it more if you want. But let's assume that I agree with you that their expert is no good for the impeachment, although I think he was impeached on things that weren't actually relating to his written description. But let's just start with that. We don't look at his testimony. I don't find anything you're convincing saying to me about your expert's testimony convincing either of supporting this. So, again, we're left with the actual specification itself, and there's nothing in it, and there's presumption of validity. Are we still bound just because of that presumption to uphold the jury's verdict, or do we look at this and say no reasonable juror could read this patent to find a type identifier? You've inverted the burden of proof. The question is, could a reasonable jury have concluded that LG met its burden on clear and convincing evidence under 282? It's a crucial statement. Correction taken. Let's say that's the question. We're free to reach that question and say no reasonable juror could refuse to find a lack of written description. I don't believe so, Your Honor, because they have a burden of proof. If they rested and didn't present any evidence on written description and just go to closing and say, here's the patent jury, the word type's not there, we win, that can't possibly be the way written description is handled, because it has to be dealt with in connection with someone who testifies from the standpoint of a skilled yard. But the fact that no type identifier is mentioned specifically is undisputed. No, it's not. It's disputed. Don't argue about this. We've already gone over this. You agreed that the actual term type identifier is not used. That's what I mean when I say type identifier is not in there. That is correct. That was the language. And so that's an undisputed fact. As is the fact that the examiners of the patent office, who are presumed to be knowledgeable about what those of skill in the art would take from a patent, agreed to this specific amendment during an office interview as being. . . But we get this all the time. They'll grant a patent, and so you get the presumption of validity, but we look at it and we say no reasonable person as a matter of law could have found this valid. The CSIRO case says that it's evidence in our favor, and this is not the typical case. Typical case, I agree, you get a patent with 30 claims in it. It's been amended 14 times, and then 10 years later someone's looking at it and somebody says the burden of proof is on the defendant. Of course it always is. This is different. We had two examiners who presumably know what people of skill in the art think who agreed with us and added the type ID because they understood from reading the patent that the patent was broader than just picking a specific number. When you proposed that amendment, did you point to them specifically in the specifications where that amendment was supported? I don't recall that one where the other yard. I assume that if you had, that we would have that evidence before us. It's just a couple of pages of prosecution history with a block quote of the examiner's interview. There's no reference, if I recall, to the support. I think you're right. I don't recall there being that, and I agree with you. We would have highlighted that if it was there. However, the question is what would one of skill in the art read? The patent office is presumed to have done its job correctly. In this case, it wasn't just some oversight or situation where you had a massively long 10-year prosecution. You had an examiner making a deal, an agreement with the patentee in the patent office, and that being challenged 10 years later. I think we should hear from the other side. You'll get an appropriate amount of rebuttal. Good morning. May it please the Court. Michael Belanco on behalf of the LG defendants. Your Honors, my plan this morning is to begin by addressing the only two issues that are entirely dispositive of the appeal. These two issues are, first, the lack of written description support for the type identifier limitation, and second, non-infringement based upon the communication controller limitation. The Court finds for LG on either it does not need to reach the remaining issues. I'll begin with written description. You will have taken note that we did not ask for a specific discussion of non-infringement from the other side. You can do with that whatever you want. Well noted, Your Honor. Let me begin with written description. Quite simply, there is no written description support for the 180 patents limitation requiring an identification number for identifying a type of display unit. To this day, after years of dispute, no party has been able to locate anywhere in the patent specification disclosing a display unit type identifier. It's simply not there. In fact, Mondes' expert, Mr. Lamb, admitted at trial that there is no express disclosure of the type identifier limitation in the specification. With that admission, the burden of production shifted to Mondes, but it never carried that burden as it provided no evidence to demonstrate written description support. Can I ask you the same question I asked of Mr. Black? You start off your whole argument in your brief by saying when identifying number is used in the spec, it is absolutely clear this is a unit-specific, unique identifying number for that unit, even if it has three million identical, they wouldn't be twins, but clones. What's your best evidence or argument or something for that basic premise that identifying number, everybody understood and would have to understand to be unique to a particular physical unit? A few places in the specification, Your Honor, in response. I direct the court to the patent. This is at Appendix 570, Column 5, Lines 36 to 38. That makes clear that it is describing a specific known display unit. How does that make clear? The problem here is, I've adverted to this before, this language of unit is impossibly ambiguous between the Michelin XG4 tire 75-R or something, of which there are millions, and you can say, well, that unit, I'm just trying to get the most fundamental thing, the distinction between token and type. I think figure 5 is perhaps illustrative on this point, Your Honor. In figure 5, we're showing an embodiment where the computer has associated with it several different display devices. We can see them here in figure 5. They're 6B, 6C, 6D. Each one of those display devices, so there's display device 1, display device 2, display device 3, has its own ID number, so ID number 1, ID number 2, ID number 3. In other words, we're talking about a specific unit that is given its own— They can be three identical displays? They could be the same TV, if they have their own ID number. The computer knows that it is talking to— Was there a point in the proceedings at which the other side kind of acknowledged that that's what an identification number is? Yeah, that's my question. I think the best evidence we have of that would probably be that— Well, we know that Mondes acknowledged that when the amendment was made, that that fundamentally changed the limitation from one identifying a specific unit, like I just discussed, to one identifying a type. So that was in their claim construction brief. This is at Appendix 6109. But more fundamentally, Your Honor, what we have here is that Mr. Lamb admitted that there is no express disclosure of a type identifier.  Of course he said that. Everybody understands. The word doesn't appear. Written description does not require in haec verba description. So we can—saying that a word doesn't appear is step one, but it doesn't establish the conclusion. Why does the substance not appear? The substance doesn't appear because the entire specification, read from beginning to back, is about the idea of associating a specific unit, display unit, that the computer has already associated itself with so it knows that it can control it. So we're talking about a unit that has been registered with the computer, and then that way they know they can communicate. And so the computer can identify the specific displays attached to it, or any other thing that's attached to it by the identification number. Why does that foreclose the additional step, though, of having a type unit? Let me give you an example. Credit card numbers are unique to each person. But almost all credit card numbers have a certain part of the credit card number that will tell you what type it is. So when you put in your number, it can instantly say, that's a Visa, that's an Amex, or the like, because it recognizes they all use the same, maybe it's a four-digit code, maybe it's a two-digit code, as part of the unique identification number. How do we know that's not what the identification number here is? That it identifies a unique unit, but a skilled artisan would understand that it also identifies a specific type of unit. Well, Your Honor, I understand the hypothetical. This specification never discloses anything like that, where you have an identification number. No, no, no. We can stop talking about whether the specification in those words discloses a specific type. Would a skilled artisan understand, nonetheless, the term identification number here to be talking about what I was talking about, which was, if you have a certain display unit from a certain company, that that identification number that's assigned to it has a unique identifier, but also a type identifier. There's no testimony on the record that would support that? Why isn't the testimony that he referred to us about talking about, the transcripts that we were just looking about, talking about the specific format enough to do that? First of all, that testimony never related communication function to a type. What Mr. Lamb said was that communication function could be a video format. That's a term that's never actually used in the specification, and what Mondes says in his briefing, I believe, is saying here also, is that you could then infer from that testimony that it relates to type. It's an inference built upon an inference, and we know from cases like this Courts Novartis case that implicit disclosure does not satisfy the written description requirement. So what we have is no express disclosure and then no testimony that goes beyond the lack of express disclosure. Why don't you address your adversary's argument that the evidence given by Lamb at 202-9091-9293 connects his theory there to the ID number for a type? I'll start, Your Honor, by He just said that to me. Right, but if you look at that testimony, there's no connection in that testimony or elsewhere from Lamb connecting that disclosure to a type identifier. It simply says that a communication function could be a video format. Again, video format, a term not used in the patent specification, and there's no connection anywhere in this record from that to the type identifier limitation. So I suppose then your argument would be that if indeed Moniz's reliance on that testimony to show that one of ordinary skill in the art would have understood possession, no reasonable juror could have believed that. We would make that argument, Your Honor. Even though you didn't challenge, you're saying you didn't view that testimony to be related to the written description issue. Right, it didn't come up in the context of written description. It was never discussed in relation to the portion of the specification they're now pointing to. It was never discussed with respect to the type identifier limitation. And after that testimony was given by Mr. Lamb, he gave the admission that there was no express disclosure. At that point, the burden shifted, the burden of production to Moniz to put on evidence to demonstrate that the written description was supported, and it never did that. And so that argument, by the way, Your Honor, the type, the column, or rather... Well, what do you do with the district court judge's opinion here that shows basically the reason why your party loses is that your witness was discredited and the jury could disbelieve anything he said? Your Honor, respectfully, we didn't mean... And so basically you have the presumption that comes with an issued patent that it satisfied written description, and you have no evidence that you put in. Your witness has been blocked. The jury can disbelieve everything your witness said. So what more is required of Moniz to save its patent? Well, a few responses, Your Honor. Respectfully, we did not need our expert, Dr. Stevenson, to support the lack of written description. I take it sequentially. You say here the question is whether or not there is no disclosure in the patent of the specific possession. Would one of ordinary skill in the art have made that reference? I think your argument has to be that the jury didn't receive any evidence relevant to that question. That's correct. I agree, Your Honor. But it has to be your case. Otherwise, anything that their expert said, the jury could have understood it, and the correct charge was given to the jury on this issue. That is correct, Your Honor. If any jurors found anything that was said by Moniz here about what one of ordinary skill in the art thinks this patent is all about, they're entitled to believe it because your challenge to their testimony is irrelevant because your witness failed. Respectfully, Your Honor, our position is that with Mr. Lamb's admission that there's no express disclosure in the patent, he would have needed to provide some sort of testimony explaining why absent express disclosure, one of skill would have understood the type identifier limitation to somehow be satisfied by the patent. What's your best case or two for that proposition, whether it's called burden shifting or something else? Tech licensing is the case that we cite. It's 545 F3rd 1316, rather, and the pin site is 1329. That talks about the burden shifting in the context of 112 argument. Another set of cases that I would point the court to are the University of Rochester and the Senate court cases. Those cases stand for the proposition that a patent may be invalid for lack of written description support based upon the four corners of the specification alone. Here we have a patent where we all acknowledge, I believe, that there's no express disclosure of the type identifier limitation without cogent testimony to somehow describe why one of skill would understand the limitation to be supported nonetheless, the patent is invalid. Let me try it this way. The way I'm thinking about it is the district court's right to disregard your expert testimony or say they could disregard it because it's an impeach. The stuff we looked at on 2290 and 91 doesn't get there for me either because it's not talking about connecting the data display format to a type identifier. Let's just assume we have zero testimony explaining how an identification number could be a type identifier. All we have at best in terms of testimony beyond the patent itself is an agreement that the actual word type identifier is not explicitly in the specification. That doesn't solve the game necessarily but if all we have is a presumption of validity and the fact that type identifier itself is not explained in actual words in the specification, the jury also has the specification itself as evidence. That's the universe we're looking at to review this, what the specification says and this acknowledgment that there is no actual description of type identifier using that phrase. Could the jury nonetheless find that the identification number as used in the specification be that type identifier? No they couldn't, Your Honor. In order for that to even be possible, the jury would need to essentially perform an obviousness type analysis and obviousness does not equate to written description support. We've cited cases in our briefing for that proposition. Power Oasis is one of them. The Ariad case is another case. It would require making inferences that are simply not supported by the specification itself and there's no testimony to guide the jury to make those inferences. They'd be engaging in an obviousness type inquiry that's not permitted to satisfy written description. Can you address the following? What's plausible coming away from this patent at some high level and maybe the high level is wrong? If, as I think a bunch of the testimony talks about this patent and its family as being fundamental to plug and play, how does it make sense to have the billion units of displays made in 2019 have their numbers in the memory of video set-top boxes that were put in people's houses in 2016 as opposed to some more type information which you could put into the set-top box to say the following families of units are going to be ones that you can communicate with? I think I understand the question, Your Honor. Let me try to address it. There's communication between the display units and the video source, which would be like the DVD player, for example. That communication in the scenario we're talking about here is controlled by the video source. It communicates information back and forth with the display unit and then determines whether it can control it and how to provide information. It's that communication once the video source is connected to the display unit that kicks off the process. That's what the specification describes as well. The two units communicate with each other and then an identifier is stored in the memory of one or the other. When the display... This is, I think, what's in column two or three about the reverse direction. Some of it is about the computer sending its ID number to the display so the display can make sure it's not being misused by some bad guy computer. But then this is the reverse. The display sends its ID number to the computer so that the computer can know what to use to communicate with it. How does the computer know that without having in its possession what amounts to a type identifier that this number is one of the ones that I can communicate with which the computer couldn't possibly have that number three years before that unit got its own number? Your Honor, I'd say with respect to this patent all of that is not required. Simply the requirement is that the video source can communicate with the display unit by knowing this is one of the units that is registered with me, I can communicate with it. That's what this patent would require. Could you just give me an example of a type of said display unit? It's not whether it's a color or a black and white TV, right? We made the argument no at trial. Correct your Honor. What is it? Not clear, not disclosed in this specification. So it's quite ambiguous and we had argued at trial that in addition to our argument on written description that all the things that Mondes was pointing to which included things like RGB type were characteristic information, a separate limitation in the patent. The file history of the patent didn't tell you anything? No, Your Honor. File history of the patent is Why they had to make this change? They made this change to overcome the sought-in prior art reference, Your Honor. Usually you can look at the prior art reference and see what it was and see why you're making the amendment to get over to get some clue as to what it means. Oh, I'm sorry, Your Honor. I maybe didn't understand your question. The prior art disclosed, or it was alleged in prosecution, the prior art disclosed the identification of a specific unit and so to get over that prior art rejection, Mondes added the limitation, well you identify a type of said identifier as opposed to identifying a specific unit. And again, Mondes admitted that that amendment changed the limitation to go from specific unit to a type of unit. Can you talk about damages? Yes, Your Honor. There are two independent bases to support the vacater of the First Trial Damages Award. First is lack of apportionment and the second is prejudicial skewing of the damages horizon. First, Mondes failed to apportion its one-size one-price-for-all patent family licenses to reflect the incremental value of just the 180 patent and no more as required by Erickson. This Court's Omega decision rejects the notion of apportionment being built into a one-price-for-all license and the district court... I'm sorry, Omega is not that broad. Omega does not say you can never have a one-price-for-all. It says in that case there was zero evidence of how to separate values in a kind of large and undifferentiated family and it wasn't enough for the patent owner simply to say this is our practice. But that leaves a vast field of unanswered questions. Let me be a little bit more specific, Your Honor. We're not making the argument and the district court didn't either. The district court recognized this that you can start with a one-price-for-all license and then from that analyze it and arrive at the value of just one patent. So what would you do about the following hypothetical? There are two patents. Somebody to make a product would absolutely have to have permission to practice both. The value of each one of those by itself is zero. Nobody would pay a dime for any of it because they still couldn't make a product. With both they can proceed. What is one supposed to do if the patent owner decides for litigation simplicity reasons to press one of the patents and not the other in litigation? Your Honor, under the facts of that hypothetical, one would need to look at what the incremental value added to the technology was for one of the patents. Both are zero. Each one is the same incremental value over the other. Your Honor, I would submit that their value doesn't need to be directly tied to the standard. One would have to look at the technical... I said nothing about standards. I said nobody could make a product that anybody would buy or enough people would buy to cover the costs of making it without practicing both of the patents. Each one by itself is worth zero. Together they're worth something. What are you supposed to do in a case in which one but not the other of the patents is asserted? How? We know the answer to the apportioned down. Each one is worth zero by itself. Together they're worth something together. I'm genuinely completely stumped about how to think about that fairly elementary problem. And standing here right now, I'm not sure either, Your Honor, but I can tell you that's not the situation that we had in this case where we know that the family had value even before the 180 patent issued. There were 12 licenses to the family before the 180 patent even issued. That's true in my hypothetical too. Of course there's value when you have all the ones you need. But not the 180 patent. That's the critical piece here. Before the 180 patent even issued, there were 12 licenses for the full family rate. That covered continuations. But the 180 patent hadn't issued yet. So what? The original licenses covered continuations of which this is one. And, Your Honor, what I'd submit is the value of the license didn't increase when that continuation matured into an actual patent. Because it made sense in this context, perhaps for the reason that my hypothetical is built on, that perhaps this is a situation in which no product could be made without the two or all of them, the whole family, because they're all kind of common core invention. And a product could be made if you have all of them. And, Your Honor, what we have... I don't know. I've yet to hear an explanation of what it even means conceptually to apportion in that situation. Now, it's a different question if you want to say, this isn't that situation because there wasn't evidence that this is a situation in which no product could be made without the missing members of the... without practicing the missing members of the family. But you haven't said that yet. What we do know, Your Honor, is that there were other blocking patents. And I'll relate it to the standard. I know that wasn't part of Your Honor's hypothetical, but there was testimony that at least four, actually four and a half, of the family members of the 090 patent family blocked the ability to the standard. And so assigning all of the value of the family rates purely to the 180 patent in this record doesn't make sense. And another point I'd like to raise, just so the record is clear, is... how do you think somebody should have gone about doing what you consider a proper apportionment? It's a pretty general idea that it's hard to beat something with nothing. What is your practical suggestion about what should have been done? In our case, what our expert did, and in fact it's an approach that Mondes adopted in the retrial, was it took the family rate and it divided it by the patents in the family that our expert concluded had value to Mondes. And so that was several of the members of the family that it valued, and it divided the rate equally between those patents. That was the approach that was undertaken. If I may, Your Honor, I just want to make sure I make this point. Mr. Black mentioned that there was a license of record, the Hon Hai license, that reflected the value of just the 180 patent. That's not the case. Section 4.4 of the Hon Hai agreement indicates that if any of the licensed patents is invalidated, the full rate remains so long as one patent in the family remains valid. There were several patents listed in that provision specifically, and so even if the 180 patent, the patent at issue here, was invalidated, but one of the other family members remained valid, the full rate applied. So taking from that that there was a license for just the 180 patent that valued the 180 patent at the full family rate is not supported by the Hon Hai license. I'm not following why what you just said is an answer to what I took Mr. Black's point to be, which is that 4.4 of the Hon Hai license says that if you had a situation where the only patent left standing was the 180, this is the price for it. Why is that not a 180 specific price? Because it happens to be a price that's shared by all kinds of other permutations. And that's precisely it, Your Honor. So that cannot represent the entire value of the 180 patent when if the 180 patent is invalidated, the full rate remains. And what we're trying to do here is apportion down the incremental value added by just the 180 patent. That's stepping back from the license. And how do you think that, I think I asked this before, but tell me again, how do you think that should have been done? What our expert did was it took the full family rate and divided it by the addition is simple. Simplicity doesn't mean it's economically sensible. Why does it make any economic sense just to divide it? All those patents had value. They blocked the ability to practice the standard. But you have to eliminate the effect of standardization from the valuing, which I know you've positively insisted on. And there was evidence on the other side that actually they weren't relying just on the fact that this was standardized. The standard here followed the incredible value of the plug and play. So that the value was inherent in the technology, not in the fact that it had been standardized. So I'm still not sure how you think an economically sound process or analysis would have worked to value this one member of the 180 family or the 090 family or whatever it was called, whichever the first patent was. I submit, Your Honor, that the way that it was done here by our expert was appropriate, which is to divide the value between the patents in the family that had value commandos. And if I may, Your Honor, I know my time's running short. There is another basis to affirm the district court's vacater of the first trial damages award, and that's the skewing of the damages horizon, which was a separate basis the district court included in its opinion for why the damages verdict should be vacated. Mondes didn't address it in its opening brief, but quite simply, this was a case quite like LaserDynamics and Unilock where Mondes took what it was asking for the license, compared it to the damages that LG had made for its televisions, and that skewed the damages horizon for the jury. So that's a separate basis for supporting the vacater. Are there no further questions? Thank you very much. Why don't you start, and we'll see how we go. Ten-ish minutes? Whatever you're willing to give me, Your Honor, that I don't overstay my welcome. Just quickly on the damages point, it does create an interesting economic issue, and the trouble at the trial and with their theory is they're sort of treating patents like buying apples at the store. If you buy one, it's one price. If you buy two, it's two or three. But what you're really getting is freedom from suit. And when there are continuation patents involved, all off the same specification, you are most of the time going to find that what the licensee is really buying is one invention, different variations on the theme. Now, that's different from most of the license cases you see, Omega and some of the others, where you have a license that's got multiple families and different inventions, and you've got to somehow find a way to get down to what would be in the hypothetical negotiation. But when it comes to a set of continuation patents on the same spec with claims that sometimes don't vary very much, there must be a way to do it, and we think we did it the best way appropriate, and we did provide evidence with respect to the relevance of the 180 to the family. With respect to the written description point and your question, Judge Hughes, about video format, in the background of the patent, there's a discussion about the problem that was being solved here by the patent, and it relates in part to what were then multi-sync monitors, which could run at different frequencies and with different inputs that were needed to make them work, and the multi-sync monitors would detect what signal they were receiving, hope that they had the right hardware in order to respond to that video format information and proceed from there. The problem simplified that by allowing for an identification number to be sent in one direction or the other. That was in the background of the reference to type in column one. It's to multi-sync monitors and how those operate. There was testimony on this from Mr. Lamb at 20369, where he said that historically displays used type IDs to generate compatible signals, and he matched that up with this multi-sync problem and with different video sources needed, which is a video format. Also, you asked where in the record there was... I think I'm remembering reading that testimony and having the thought pass through my mind. Why doesn't that suggest, maybe suggest rather strongly, that the rest of the specification in talking about what the new invention was, was in fact to move away from type information? No, no, because the issue was that the multi-sync monitors were detecting the signal based on frequency information, which is inefficient. You could only have a certain number of things in the memory that would allow it to configure properly and you were limited in how it could connect to certain things. It could only handle certain video formats. This allowed for just sending a number across, just one number and then the devices would know how to react to each other. And as your Honor pointed out, this was trying to solve an industry-wide problem and therefore as new monitors come out in years in the future and connect it, you need a way in order to make sure that they coordinate together. The column 5 discussion about the use of an identification number to distinguish between devices that had a communication function and those that did not and Mr. Lamb said that means a video format was getting to that problem. LG's theory of the case was that identification number could only mean a specific number for a specific unit, but Dr. Stevenson testified to the contrary and Mr. Lamb testified that identification... Just to be clear, if I remember the Stevenson testimony that you're relying on, what he said was that there's a serial number. A serial number is in fact unique to the unit but embedded within it, this is what Judge Hughes was talking about on the credit cards, you can have area codes in the old landline days or addresses in which you say city and state. That's all type information that's embedded in a unique identifier. And I thought what Dr. Stevenson said was that serial numbers of course can have that information embedded in it, but not that it was anything other than a unit unique number. Well, that's he said his testimony was not that. He didn't say that. That's maybe an interpretation you're putting on that testimony but the jury's not required to accept that. When he said that the type ID of the claim could be a serial number and a serial number is an identification number... Which could have type information. It could be, yeah, is what he said. Right. And everybody in the courtroom heard him. The judge heard him, we heard him, the jury heard him and they were entitled to interpret that evidence as being contrary to his other positions that he had taken. Even though they were also entitled to disbelieve everything he said. Correct. Now how do they decide which piece of his testimony to believe and which not? That is the way our jury system works. That's why we have a division of labor between judge, jury, and appellate court. And respectfully, we believe that decides this case on written description because they had the burden on clear and convincing evidence to establish the patent was invalid, that someone who's still in the arc reading it would not understand the claims to be supported, that the patent office, the two examiners got it wrong, and when they put up a defective witness who's impeached, they just can't meet their burden with that. And the argument we've had today is doesn't address that issue. They did not meet their burden of proof by clear and convincing evidence. Can I ask you, this is beyond this case, but are there other cases out there involving this patent that are going to be affected by their written description termination here, or the damages determination model that we come up with, or is this it? This is it. The licensing program is over. LG is the last case. So we're arguing about the difference between $14 million and however many million dollars on a second appeal, and what we're doing is not going to affect any other case. It will not affect any other case. This patent is expired and it's been licensed to everybody. LG is licensed once to LG. This is the last case. We would also ask that the court look at the interest decision here, which we think the judge awarded us the lowest interest rate in the last 10 years, and probably maybe ever in the Third Circuit, and on remand, if there is one, we would ask that you look at interest as well. That's all I have. Thank you very much. Thanks to all counsel. The case is submitted.